IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LISA HYNES,
      Plaintiff,

vs.                                   Case No. 3:07cv245/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

       This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34.

       Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

I.     PROCEDURAL HISTORY

       This suit involves an application for DIB under Title II of the Act, filed by Plaintiff on March 25, 2002 (Tr. 60–62).[1]  The application was denied initially and on reconsideration, and Plaintiff then requested a hearing before an administrative law judge (ALJ) (Tr. 25–26, 35–36).  The ALJ

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on September 4, 2007 (Docs. 7, 8).

held administrative hearings on October 26, 2004 and June 15, 2005 (Tr. 588–609, 610–22).  On October 26, 2005, the ALJ issued a decision in which he found that Plaintiff was "not disabled" as that term is defined in the Act (Tr. 12–23).  On April 27, 2007, the Appeals Council denied Plaintiff's request for review (Tr. 8–11).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998); 42 U.S.C. § 405(g).  This appeal followed.

II.    FINDINGS OF THE ALJ

On October 26, 2005, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15–23):

1)    Plaintiff's application for DIB, filed March 25, 2002, alleges disability since August 1, 2001.

2)    Plaintiff met the requirements for insured status for disability on her alleged disability onset date, and continues to meet them through October 26, 2005.[2]

3)    Plaintiff has the "severe" impairments of migraine headaches, history of angle-closure glaucoma with right eye surgery, fibromyalgia, multiple arthralgias, cervical degenerative disc disease, pain disorder associated with both psychological factors and a general medical condition, bipolar disorder, depressive disorder, and personality disorder, NOS.

4)    Although Plaintiff has severe impairments, she does not have an impairment or combination of impairments that meet or medically equal the requirements of any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

5)    Plaintiff's allegations of subjective complaints and functional limitations are not supported by objective evidence in the disabling degree alleged, and therefore, lack credibility.

6)    Plaintiff is a younger individual with more than a high school education and past relevant skilled work as an event coordinator for a restaurant, magazine sales representative, owner/operator of an advertising agency, and owner/director of a communications agency.  These jobs were each performed at the light exertional level and for at least one year or more, but they provided no transferable skills.

---

[2]Thus, the time frame relevant to this appeal is August 1, 2001 (alleged onset) to October 26, 2005 (date last insured).

7)     Plaintiff can return to work she has performed in the past.

8)     Plaintiff was not under a disability as defined in the Act at any time through October 26, 2005, the date of the ALJ's decision.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity (SGA) by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or

mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, she is not disabled.

2.      If the claimant is not performing SGA, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing SGA and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal History[3]

---

[3]Unless otherwise noted, the information in this section is derived from the opinion of ALJ (Tr. 15–23)

Plaintiff alleged that she is disabled because of chronic migraine headaches and fibromyalgia causing "severe pain most of the time" (Tr. 77–86).  At her hearing before the ALJ in October 2004, she testified that she was unable to work because of the "unpredictability" of her symptoms such as migraine headaches that last from one to seven days.  She said that on average she has three migraine headaches a month and uses Lortab and a cold bath and ice on her head in attempts to relieve the pain.  Plaintiff stated that her migraine headaches are her worst problem.  She stated that she felt that the onset of her disability was in August 2001 because that is when she stopped working at the radio station due to being "chronically absent."  She did not apply for unemployment compensation when she stopped working.

Plaintiff further testified that because of her medical conditions she is able to sit only for 45 minutes to one hour, she can stand only 30 minutes because of swelling in her feet and legs, and she can walk less than one block or approximately one-quarter of a mile.  She is right-hand dominant and has tendonitis in her right arm, and she estimated that she could lift a gallon of milk.  Plaintiff testified that she sleeps poorly because of her mind racing in pain.  A usual day for Plaintiff consists of getting up around 9:00 a.m., drinking coffee, taking medication, feeding her pet, running errands such as going to the grocery store or post office, listening to the radio and meditation tapes obtained from her neurologist, and resting during some days.  Plaintiff testified that she has a driver's license and continues to drive, she attends church every Sunday, and she shops and attends to her personal needs without assistance.  Plaintiff testified that she was involved in a boyfriend/girlfriend relationship, and having no income of her own, lives with either her parents or a friend.

B.      Relevant Medical History from 2001–2005[4]

1.      Year of 2001

On February 3, 2001, Plaintiff presented to the emergency room (ER) with a migraine headache and nausea, and she was crying (Tr. 372–75).  Plaintiff returned the next day and was again noted to be crying and holding her head (Tr. 376–82).  On February 22nd, she returned to the ER with a migraine that caused nausea and vomiting (Tr. 384).  Plaintiff went to the ER again on June 9th with a migraine headache (Tr. 394).  It was noted that she was anxious (Tr. 395).

---

[4]The information in this section is derived from Plaintiff's memorandum in support of her complaint, including Plaintiff's references to the transcript (Doc. 12).

On June 15th, Plaintiff had her initial visit with neurologist Thomas Syverson, M.D., for migraine headaches.  Dr. Syverson noted that Plaintiff had suffered headaches since the age of five and that she is allergic to Imitrex and Maxalt, which are "triptan" medications and are prescribed for the relief of migraine headaches, although they do not prevent or reduce the number of migraine attacks.  Dr. Syverson also noted that Plaintiff's migraines were interfering with her professional life and last as long as three weeks.  His diagnosis was long-standing classic hemicranial migraine.  Dr. Syverson continued Plaintiff's prescriptions for Midrin and Depakote, he added Klonopin, and he ordered several tests and recommended occipital nerve blocks (Tr. 203).  The next month, on July 7th, Plaintiff was again seen in the ER, tearful, and with a migraine (Tr. 162–66).

On July 11th, Dr. Syverson performed occipital nerve blocks (Tr. 201).  Plaintiff returned to him on July 19th, even though Dr. Syverson had not anticipated a need to see her for twelve weeks.  Plaintiff was concerned about a "good deal of swelling" she recently suffered concurrent with a headache (Tr. 200).[5]

Plaintiff left her job as a sales person at Cumulus Broadcasting on August 1, 2001, after she was confronted by the office manager about her frequent absences due to illness (Tr. 607).  She called Dr. Syverson's office the same day, and he switched her from Depakote to Neurontin due to weight gain and fluid retention associated with Depakote (Tr. 197, 199).  On August 27th, Dr. Syverson increased Plaintiff's dosage of Neurontin and noted that Plaintiff cannot take "triptans" (Tr. 197).

On September 25th, at an examination for a follow-up of her thyroid condition by her primary care doctor, H.M. Meredith, III, M.D., it was noted that Plaintiff was "crying during a good bit of the exam. . . ." (Tr. 354).  Plaintiff resumed her care with rheumatologist Ellen McKnight, M.D., on September 27, 2001.  A comprehensive examination on that date revealed continued fibromyalgia despite the removal of Plaintiff's silicone breast implants in July 1994. It was recommended that Plaintiff begin "physical therapy to include fibromyalgia protocol . . . ."  Dr. McKnight also prescribed Celebrex, Zanaflex, Calcium, Vitamin D, and Glucosamine. (Tr. 172–75)

---

[5]Plaintiff later reported (during a psychological evaluation with Lawrence Gilgun, Ph.D., on May 6, 2002) that she thought the occipital nerve blocks performed by Dr. Syverson "made matters worse instead of better, indeed aggravating her shoulder and neck pain and creating spasms" (Tr. 211).

2.      Year of 2002

On February 8, 2002, Plaintiff went to the ER due to a migraine with nausea and photophobia (Tr. 402–05).  On February 25th, she returned to the ER with a migraine that again caused photophobia, nausea, and vomiting (Tr. 407), and she returned again on March 27th with a migraine that caused blurred vision (Tr. 206).

On May 6th , Plaintiff saw psychologist Lawrence Gilgun, Ph.D., for an evaluation through Vocational Rehabilitation (VR).  Dr. Gilgun opined that "the chances of VR helping her are guarded."  He stated that "the real crux of the dilemma with her is finding employment that would accommodate to her very severe headache pain" (Tr. 213).

On May 8th, Plaintiff was admitted to the Crisis Stabilization Unit at Lakeview Center for thoughts of hurting herself, overwhelming fear, and sadness (Tr. 290).  Plaintiff was discharged the next day with a treatment plan and a prescription for Paxil (Tr. 289).  On May 28th, VR sent Plaintiff to an evaluation at the Phoenix Rehabilitation Corporation (Tr. 131–39).  Rehabilitation counselors, Leslie Gillespie and Mark Laufer, determined that Plaintiff was "not considered a candidate for training based on her current vocational profile due to the fact that she is unable to work consistently from day to day" (Tr. 137).  The counselors wrote that, "Ms. Hynes is considered totally disabled from full-time work . . . ." (Tr. 132).

On May 31, 2002, Plaintiff began treatment with Frank Zondlo, M.D., a pain management physician (Tr. 307).  Dr. Zondlo noted that Plaintiff's "Sensation is impaired in the medial, lateral, and posterior right calf and in the medial nerve distribution of the right hand.  The back is exquisitely tender over the right sacroiliac joint.  There is also tenderness in the right scapular area that conforms precisely to the T1 and T2 facet joint pain distribution."  Dr. Zondlo determined that Plaintiff has neck pain, headaches, and "severe right sacroiliac joint pain, which limits her ability to stand, sit, walk and bend" (Tr. 308).

On June 8th, Plaintiff again went to the ER with a migraine causing throbbing pain, photophobia, and nausea (Tr. 411).

Plaintiff was seen by psychiatrist Cynthia Javellana, M.D., on June 19th and was assessed with a Global Assessment of Functioning (GAF) score of 55–60.[6]  Dr. Javellana's diagnoses included Depressive Disorder and Mood Disorder, rule out Bipolar Disorder (Tr. 288).  On September 30th, when Plaintiff next saw Dr. Javellana for medication management, she was "quite tearful" and was assessed with a GAF of 55 (Tr. 287).

On July 10th, Dr. Zondlo performed diagnostic sacroiliac joint injections and diagnostic T1 and T2 facet joint nerve injections (Tr. 304).  On July 24th, Plaintiff treated with Dr. Zondlo for radiofrequency denervation (Tr. 301).[7]  He subsequently administered an epidural steroid injection on August 5th in an effort to alleviate her thoracic radiculopathy (Tr. 299).  On October 2nd, Dr. Zondlo reported that Plaintiff "has been unable to work due to her headaches" (Tr. 298).

On October 8th, Plaintiff presented to the ER with pain, swelling, and decreased vision subsequent to starting Topamax for migraines (Tr. 271).  She was found to be anxious, laughing to crying, angry, aggressive, and she threatened to "close this hospital down" (Tr. 272).  The next day, she saw ophthalmologist Edward Galbavy, M.D., Ph.D., who promptly referred her to eye surgeon, Tim McLaughlin, M.D. (Tr. 282).  The same day, on October 9th, Dr. McLaughlin immediately performed laser surgery after he determined that Plaintiff had bilateral acute angle closure glaucoma due to taking Topamax (Tr. 349).  He performed laser surgery again on October 10th (Tr. 346), then followed-up with Plaintiff on the 11th, 14th, and 25th (Tr. 342–45).  In a letter to Social Security on January 21, 2003, Dr. Galbavy stated that Plaintiff had significant improvement, and her intraocular pressures were stable (Tr. 283).  Since this episode, Plaintiff has been unable to take Topamax.

---

[6]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  Id. at 32.  A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  Id.

[7]According to Plaintiff, this procedure involves burning of the nerve roots that are sending pain signals to the brain.  It must be performed while the patient is conscious, because the patient assists the doctor in identifying which nerves are sensory and which nerves are motor.  The doctor seeks to avoid damaging the motor nerve roots, because such destruction could cause paralysis, foot drop, etc. (see Doc. 12 at 7 n.2; see also Tr. 302 (Dr. Zondlo's description of the procedure)).

On October 28th, Plaintiff went to the ER with a migraine that was causing blurred vision, photophobia, nausea, and vomiting (Tr. 273).  She met with Dr. Zondlo on November 20th for a reevaluation of her condition.  Dr. Zondlo noted that Plaintiff is disabled due to her pain (Tr. 530).

3.     Year of 2003

On January 7, 2003, Plaintiff again treated with Dr. Zondlo for pain management.  At that time, Dr. Zondlo was awaiting authorization from VR to perform further injections (Tr. 528).

On January 17th, Plaintiff was seen by Dr. Javellana for medication management and was assessed with a GAF of 50.[8]  Her diagnoses at that time were Bipolar Disorder, mixed type; Panic Disorder; and Mood Disorder, secondary to chronic pain (Tr. 285).  Anxiety Disorder was ruled out (*id.*).

Plaintiff saw Dr. Zondlo on March 24th for pain management, as the benefit from the thoracic epidural injection of August 5, 2002 had worn off.  On examination, Dr. Zondlo noted "sensory deficit in the right T3 and T4 distribution extending to the mid-sternal line therefore involving the entire dermatomes, and tenderness in the right T2 through right T4 paraspinal muscles extending into the posterior right axilla.  There is also exquisite tenderness to palpation focally in the right low occipital area and a lesser degree of tenderness in the right low cervical spine and right trapezius muscle." (Tr. 527).

Plaintiff returned to Dr. Javellana for medication management on May 2nd and was again assessed with a GAF of 50.  She was visibly anxious, irritable, and depressed.  "She was crying and tearful during the evaluation," and her cognitive functions were limited.  Her diagnoses at that time were Bipolar Disorder, mixed type; Depressive Disorder with anxiety symptoms, and  Panic Disorder and Mood Disorder were ruled out (Tr. 284).

Dr. Zondlo administered an epidural steroid injection on May 29th.  He stated that Plaintiff had "clinical changes on examination consistent with recurrent thoracic radiculopathy" (Tr. 293).  Plaintiff followed-up with Dr. Zondlo on June 18th, at which time he noted that Plaintiff has no

---

[8]A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or  school functioning (e.g., no friends, unable to keep a job).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

insurance coverage.  He continued Plaintiff's prescription for Hydrocodone and recommended that Plaintiff return in three months (Tr. 292).

            4.      Year of 2004

On February 1, 2004, Plaintiff presented to the ER with a migraine headache (Tr. 469). Three days later she saw Dr. Zondlo for a reevaluation of her pain.  Dr. Zondlo noted that Plaintiff's "primary pain . . . is reportedly severe headache occurring one to two times per week and often requiring treatment in the emergency room to resolve" (Tr. 524).  On February 17th, Dr. Zondlo attempted to administer a diagnostic injection, but Plaintiff "became near hysterical from pain . . ." and the procedure was discontinued (Tr. 523).  The same day Plaintiff saw her primary care physician, Joseph Howard, M.D., with complaints of chest pain and her left hand being cold, numb, and tingling.  Dr. Howard also noted arthralgia and ordered, among other tests, an x-ray of the cervical spine, an EKG, a stress test, and an ANA screening (Tr. 452).  On April 23rd, Dr. Howard noted Plaintiff's migraine headaches and eye twitching (Tr. 445).  He sent her to the ER for injections of Toradol and Phenergan to treat her migraine and the associated nausea (Tr. 447).  On May 4th, Plaintiff again treated with Dr. Howard with complaints of a migraine that had been going on for some time.  He prescribed Toradol to treat the migraine (Tr. 443).

On May 18th, Plaintiff saw Dr. Zondlo for another radiofrequency denervation in an effort to resolve her migraine headaches (Tr. 440).  On July 12th, Dr. Zondlo completed a Clinical Assessment of Pain form and indicated that in his best clinical judgment, Plaintiff's "pain is present to such an extent as to be distracting to adequate performance of daily activities or work" (Tr. 487–88).  He also stated that Plaintiff has "an underlying medical condition consistent with the pain . . . she experiences" (Tr. 488).  Plaintiff followed up with Dr. Zondlo on August 4th after the radiofrequency denervation.  Dr. Zondlo noted that she continued to have migraines with photophobia, phonophobia, nausea, and vomiting.  He stated that she has thus been "unresponsive on a prolonged basis to radiofrequency degeneration."  He recommended that Plaintiff undergo diagnostic injections of the right third occipital nerve and the right C3 medial branch and continue her current medications (Tr. 522).

Plaintiff returned to Lakeview on August 31st and was assessed with a GAF of 55 (Tr. 515–18).  She subsequently met with Dr. Javellana on September 24th, at which time she resumed

taking Depakote and was assessed with a GAF of 55.  Plaintiff agreed to go back on Depakote because she acknowledged the need for a mood stabilizer and admitted that "her life has become somewhat chaotic being off of medication for a year" (Tr. 513–14).  On November 23rd, Plaintiff was seen by Dr. Javellana and stated that she was taking Depakote, but she was quite concerned about her weight gain.  She was anxious, depressed, and tearful (Tr. 563).  Her GAF on that date was assessed at 48–50 (Tr. 564).

5.      Year of 2005

On January 25, 2005, Plaintiff was evaluated by psychiatrist Jose C. Montes, M.D., at the request of the Office of Disability Determinations (DD) (Tr. 556–59).  Dr. Montes's assessment included a "history of bipolar disorder, chronic migraine headaches, degenerative arthritis of the shoulder and wrist and 'rule out' fibromyalgia/lupus."  He indicated a fair prognosis as long as Plaintiff continued her outpatient psychiatric treatment and strongly recommended that she remain compliant with the treatment (Tr. 559).  On February 10th Plaintiff was examined by neurologist Daniel Bader, M.D., at the request of the DD (Tr. 548–51).  His physical examination revealed a positive Tinel's sign bilaterally (Tr. 550).  His impression was "chronic migraine" with little, if any, resulting limitations (Tr. 551).

Plaintiff saw Dr. Javellana on February 22nd, for medication management.  She reported pain and frustration with the continued occurrence of her migraines.  Her GAF was assessed at 50 (Tr. 562).  On March 28th, Dr. Javellana gave a sworn statement in which she opined that "it would be extremely difficult for Plaintiff to maintain [work on a regular and continuing full-time basis] on a day-to-day basis" (Tr. 572).  She stated that, "overall, [Plaintiff] really reflects a very unstable psychiatric condition and she does have real difficulty in maintaining gainful employment with this" (Tr. 574).  In discussing the "Supplemental Questionnaire as to Residual Functional Capacity," Dr. Javellana estimated that Plaintiff had marked restriction in her ability to complete activities of daily living, and she had similar difficulty in her ability to maintain social functioning (*see* Tr. 573–74).  Dr. Javellana also stated that Plaintiff would have marked limitations due to episodes of deterioration or decompensation (Tr. 574).  Finally, she stated that in a work setting Plaintiff's abilities to follow instructions, respond appropriately to supervision and co-workers, perform simple tasks, and perform repetitive tasks would be markedly limited (*see* Tr. 573–75). Dr. Javellana stated

that the aforementioned impairments existed from the date Plaintiff was admitted to the Crisis
Stabilization Unit in 2002, and that the indicated level of severity would continue into the
foreseeable future (Tr. 576).  When asked whether Plaintiff's medications cause any side effects, Dr.
Javellana stated that "in the past she had major problems with side effects and ability to tolerate
other medications.  So we're kind of cautious about her medications because of that history of
problems" (*id.*).

     C.     Other Information Within Plaintiff's Claim File

At Plaintiff's hearing before the ALJ on June 15, 2005, a Vocational Expert (VE) testified
regarding Plaintiff's ability to engage in SGA (Tr. 613–22).  The VE testified that according to Dr.
McKnight, Plaintiff meets the listing for typical rheumatic syndrome and no SGA would be possible
(Tr. 617).  The VE also testified that a GAF of 55 and below would affect Plaintiff's "ability to do
basic work activities" and "would preclude adequate functioning" (Tr. 618).  The VE further
testified that according to Dr. Zondlo's assessment in the Pain Questionnaire, no work would be
possible (*id.*).  Similarly, the VE testified that according to Dr. Javellana's sworn statement, no SGA
would be possible (Tr. 618–19).  Finally, the VE testified that according to Plaintiff's testimony
regarding the frequency of her migraines, her missed work, and her sitting, standing, and walking
limitations, no SGA would be possible (Tr. 619).

V.     DISCUSSION

Plaintiff generally contends that the ALJ erred in determining that she has the ability to
return to her past relevant work, asserting that the record documents her inability to maintain
employment because of the frequency of her absences due to severe migraine headaches, bipolar
disorder, and fibromyalgia (Doc. 12 at 14).  Specifically, Plaintiff asserts that the ALJ erred in
reaching this finding because he: 1) erroneously rejected the opinions of three of Plaintiff's treating
physicians (Drs. McKnight, Javellana, and Zondlo) and erred in assigning "great weight" to the
opinions of two consultative examiners (Drs. Montes and Bader); 2) erred by failing to follow the
Eleventh Circuit's pain standard; and 3) erred in relying on the VE's answer to a hypothetical
question because the question did not comprehensively describe Plaintiff's impairments (*id.* at
12–24).

     A.     Opinions of Treating Physicians and Consultative Examiners

The ALJ rejected the opinions of three of Plaintiff's treating physicians in order to reach a finding that she was not disabled.  Further, he assigned great weight to the findings of two consultative examiners, Drs. Montes and Bader, who each evaluated Plaintiff on only one occasion. Plaintiff contends the ALJ erred in this regard.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439–1441 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991);  <u>Sabo v. Commissioner of Social Security</u>,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

1.      Treating Physicians

a.      Dr. McKnight wrote a letter in 1994 in which she stated that Plaintiff had a rheumatic syndrome as a result of breast implants (Tr. 489–90).  The ALJ noted that based upon the 1994 letter, Plaintiff "met the criteria [at that time] for the diagnosis of atypical rheumatic syndrome and had significant functional limitations, which would have met the requirements of one or more listed impairments.  Nevertheless, the evidence documents improvement in [Plaintiff's] symptoms subsequent to the removal of silicone breast implants as well as other treatment measures." (Tr. 18).

The record confirms that Plaintiff's breast implants were removed in April 1994, and in May 1994, that she reported to Dr. McKnight "she has been feeling a little better since" their removal (Tr. 178).  Similarly, in July 1994, Plaintiff reported "doing better recently," and Dr. McKnight opined that Plaintiff's physical therapy/exercise and implant removal were likely accounting for some of Plaintiff's improvement (Tr. 177).  In September 1994, Dr. McKnight opined that Plaintiff "did have some slight improvement" following the implant removal, although she continued to have problems such as joint pain, back pain, fatigue, and difficulty concentrating (Tr. 490).  Thus, the record supports the ALJ's finding because it documents improvement in Plaintiff's condition following removal of the implants, even though Plaintiff continued to report some problems.

Moreover, the record reflects that Plaintiff did not return to Dr. McKnight for further treatment until September 2001, seven years later (*see* Tr. 175).  *See* <u>Watson v. Heckler</u>, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and

demeanor at the hearing); *see also* <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).  Additionally, Plaintiff continued to work through the year 2001 and does not claim that she was disabled until August 2001 (*see, e.g.*, Tr. 63).  Thus, Dr. McKnight's letter from 1994 has little relevance, if any, to Plaintiff's instant claim for benefits.  The ALJ was therefore correct in noting that although Plaintiff may have previously met the requirements of a listed impairment, her condition improved since that time (which is documented by the record and further evidenced by Plaintiff's failure to seek treatment), and Dr. McKnight's 1994 opinion was properly discounted by the ALJ.

> b.   Dr. Javellana

On March 28, 2005, Dr. Javellana, Plaintiff's treating psychiatrist, gave a sworn statement to Plaintiff's counsel regarding Plaintiff's limitations (*see* Tr. 565–83).  In pertinent part, Dr. Javellana testified that she first saw Plaintiff when Plaintiff was admitted to the Crisis Stabilization Unit at Lakeview Center in May 2002, following "increasing depression and . . . suicidal thoughts" (Tr. 568–69).  Plaintiff followed up with Dr. Javellana on an outpatient basis, although Plaintiff did not appear for treatment for a period of approximately one year, from August 2003 to September 2004 (Tr. 570).  Dr. Javellana testified that Plaintiff was generally treated for depressive symptoms, hypomania, mood swings, frustration, and difficulty concentrating, and that she was treated with medication (Tr. 570–72).  Throughout the course of treatment, Dr. Javellana assigned Plaintiff GAF scores ranging from 50 to 60 (Tr. 571), although on one occasion, November 23, 2004, her GAF was assessed at 48–50 (Tr. 564).  Dr. Javellana opined that it would be "extremely difficult" for Plaintiff to maintain full-time work, and that Plaintiff has "marked" limitations in her ability to function socially or in an occupation (*see, e.g.*, Tr. 572).

The ALJ declined to give Dr. Javellana's opinions controlling weight, and he provided several reasons for doing so.  First, the ALJ noted that Dr. Javellana assessed a GAF score of 50 to 55 in August 2003, but Plaintiff "performed substantial gainful activity on a full time basis for a continuous period of at least eight months" following these GAF assessments (Tr. 20).  The record

reflects that Plaintiff was assessed GAF scores of 50 in January and May 2003,[9] which is not exactly what the ALJ stated, but the discrepancy is inconsequential (*see* Tr. 284–85).  The record further reflects, as the ALJ noted, that Plaintiff was employed by Twelve Oaks from September 2003 through May 2004 (Tr. 143).  Moreover, a Twelve Oaks work performance evaluation from January 2004 reveals that Plaintiff had only two excused absences "due to migraines," she did very well, and it was recommended that she continue full-time employment (Tr. 148–49).[10]  *See* <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1078 (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period); <u>Harris v. Barnhart</u>, 356 F.3d 926, 930 (8th Cir. 2004) ("it was also not unreasonable for the ALJ to note that Harris's . . . part-time work [was] inconsistent with her claim of disabling pain"); *see also* 20 C.F.R. § 404.1571 (work performed during any period in which Plaintiff alleges that she was under a disability may demonstrate an ability to perform SGA).  Notably, the Twelve Oaks work records do not reflect <u>any</u> work-related difficulties due to Plaintiff's mental condition, which is the condition relevant to Dr. Javellana's opinions; the record reflects only some absences due to Plaintiff's migraines.  Indeed, Plaintiff's work evaluation reveals that she "exceed[ed] requirements for working with [the] adult population in [an] excellent manner," she completed assignments and requests, and she reported to work (or "call[ed] in") in a timely manner (Tr. 148–49).  Thus, Plaintiff's ability to work and receive excellent work reviews is indeed inconsistent with Dr. Javellana's opinions.

Plaintiff takes issue with the ALJ's consideration of her employment, noting that it alone does not negate disability and asserting that other factors should be considered, such as the length of time Plaintiff held the job and her reason for leaving (*see* Doc. 12 at 18).  Here, Plaintiff held the job for approximately eight months and had few absences.  More important, it appears that Plaintiff left the job at Twelve Oaks because she "did not like it," not because it required mental abilities

---

[9]A review of the file by the undersigned revealed no August 2003 GAF assessment by Dr. Javellana.

[10]Another notation appears to reflect that Plaintiff missed four days of work in a ninety-day period, but either way, her absences did not result in any negative comments or adversely affect her employment evaluation (*see* Tr. 148–49).

beyond her capabilities (*see* Tr. 517).[11]   Thus, the ALJ did not err in finding that Plaintiff's employment with Twelve Oaks was inconsistent with Dr. Javellana's opinions that she was mentally unable to work.

Next, the ALJ noted that Plaintiff was noncompliant with her treatment, failing to return to Dr. Javellana for one year (Tr. 20).  The ALJ did not err in considering that Plaintiff failed to appear for treatment from approximately August 2003 to September 2004, which is within the time frame relevant to this appeal (Tr. 570).  *See, e.g.,* Bentley v. Shalala, 52 F.3d at 786 (8th Cir. 1995) (proper to consider failure to seek treatment for a long time during a claimed period of disability).

In further discounting Dr. Javellana's opinions, the ALJ noted that her treatment records were inconsistent with her opinions, as was Plaintiff's "demonstrated ability to perform substantial gainful activity on a full-time basis" (Tr. 21).  Initially, to the extent Plaintiff successfully worked full time during part of 2003 and 2004, the ALJ's statement is clearly supported by the record, and the ALJ did not err in considering Plaintiff's work.  With regard to whether Dr. Javellana's treatment records are inconsistent with her opinions, the analysis is a bit more complicated because the ALJ failed to specifically identify any inconsistent records or explain why they are inconsistent.  The ALJ did discuss, however, Plaintiff's noncompliance with treatment, which is documented in Dr. Javellana's records, and is inconsistent with a disabling mental condition (*see, e.g.*, Tr. 517 (Dr. Javellana noted that Plaintiff's compliance with treatment "has been a problem, and we did discuss this at length, [and Plaintiff] acknowledge[s] that she will continue to follow up with her outpatient care"), Tr. 521 (noting that Plaintiff was "non compliant" with "several appointments," and her chart was closed "due to noncompliance")).  Further, the treatment records suggest that Plaintiff's mental conditions are controlled when she is compliant with treatment, including medication (*see, e.g.*, Tr. 515–16 (after failing to seek treatment for one year, Plaintiff returned to Dr. Javellana and noted that she needed "to be back on her medicine," which she had apparently quit taking because of weight gain); Tr. 513–14 (Plaintiff agreed to go back on Depakote, admitting that "her life has become somewhat chaotic being off of medication for a year")).  Thus, inconsistencies between Dr.

---

[11]Although Plaintiff testified at her hearing that she could not "physically" do the job, the thrust of her testimony was that she did not like the job because she was not comfortable being around "drug addicts and things like that" (Tr. 594).  Moreover, nothing in her work evaluation supports her assertion that she was physically unable to do the job.

Javellana's records and her opinions appear to exist, but it is unclear which were relied upon by the ALJ.

In sum, two of the ALJ's reasons for discounting Dr. Javellana's opinion have clear support in the record, and the other reason appears to be supported by the record but was not clearly articulated by the ALJ.  The court concludes, however, that the two reasons with clear support in the record are sufficient to uphold the ALJ's ultimate decision to discount Dr. Javellana's opinions, regardless of the existence or nonexistence of a third reason.  Plaintiff's noncompliance with treatment is well-documented, and her ability to excel at her job at Twelve Oaks is the best evidence of her true mental capabilities — especially considering that Plaintiff quit that job because she did not like it, not because she was mentally incapable of performing it.  Thus, the ALJ did not err in discounting the opinions of Dr. Javellana.

c.        Dr. Zondlo

The ALJ provided two reasons for discounting Dr. Zondlo's July 2004 opinion that Plaintiff "experienced pain that was distracting to adequate performance of work."  First, the ALJ stated that the opinion is inconsistent with Plaintiff's activities, including her work activity and her participation in a college course seeking a degree in management (*see* Tr. 22).  The ALJ, however, did not specifically identify the "work activity" to which he refers or what formed the basis for determining that Plaintiff was seeking a college degree.

This court's review is complicated by the ALJ's failure to indicate the nature of Plaintiff's "work activity."  To the extent Plaintiff's work at Twelve Oaks was the "work activity" referenced by the ALJ, the undersigned agrees that it demonstrated Plaintiff's ability to work for approximately eight months, despite some absences due to her migraines.  The Commissioner, however, has pointed to Plaintiff's sales work on E-Bay, and as a salesperson at Amazon bookstore for twenty hours a week, as the "work activity" to which the ALJ refers (*see* Tr. 22; Doc. 17 at 6).  However, if this is indeed the work referenced by the ALJ, these jobs do not appear to be "jobs" in the traditional sense.  Sales work on E-Bay can likely be performed when Plaintiff is not experiencing pain or headaches, which is also likely the case with her bookstore work, but the record contains no description of these jobs (such as the flexibility of Plaintiff's work hours), and to the extent the ALJ relied on these jobs to discount Dr. Zondlo's opinion, he erred.

As to the attempt at a college degree, Plaintiff's counsel has pointed the court to one page in the record that might support the ALJ's statement, namely, a record containing Plaintiff's report to Dr. Javellana on August 31, 2004, that she was "currently enrolled in an on-line school for business management" (Tr. 517).  However, on-line courses are a far cry from "participating in college courses" in the traditional sense — that is, traveling to campus, walking to class, sitting through class, etc.  The court cannot conclude that Plaintiff's ability to take an on-line computer course is necessarily inconsistent Dr. Zondlo's opinion.  Thus, with regard to the first reason for discounting Dr. Zondlo's opinion, the court finds only that Plaintiff's ability to work at Twelve Oaks is a proper consideration, assuming that is the "work activity" considered by the ALJ.

Second, the ALJ found that Dr. Zondlo's records indicate "resolution of pain symptoms following interlaminar epidural steroid injection[s]" (Tr. 22).  The record supports this statement, but the statement is somewhat misleading because the injections did not relieve all of Plaintiff's pain and did not provide permanent relief.  For example, the record reflects that on October 2, 2002, Plaintiff reported "right axillary pain and sensory deficit" relief for two weeks following an interlaminar epidural steroid injection, but 50% of her pain returned, and her "incapacitating" headache pain was not resolved (Tr. 298, 529).  Another report from Dr. Zondlo, dated May 29, 2003, suggests that Plaintiff got "eight months relief" from an earlier interlaminar thoracic epidural steroid injection," and "90–100%" relief from thoracic spine pain immediately following an injection on May 29, 2003 (Tr. 293–94).  Similarly, Plaintiff reported "90–100%" relief following radiofrequency denervation on May 18, 2004 (Tr. 536).  However, on August 4, 2004, Dr. Zondlo specifically noted that Plaintiff "was unresponsive on a prolonged basis to radiofrequency denervation procedure[s]," including a recent procedure performed on May 18, 2004 (Tr. 522).  Additionally, although based on Plaintiff's self-report, Dr. Zondlo also noted on August 4, 2004, that Plaintiff continued to have pain and headaches with associated nausea, vomiting, phonophobia, and photophobia (*id.*).

Although injections may have provided some pain relief, as described in the foregoing paragraph, it is far from clear to the undersigned that the injections provided any real relief from the recurring pain associated with Plaintiff's migraine headaches (as opposed to, for example, thoracic spine pain).  Indeed, Dr. Zondlo's records seem to suggest that the injections did <u>not</u> provide

migraine headache relief, Plaintiff's migraines returned without warning, and the migraines were often long-lasting and debilitating.  This is especially important here because Plaintiff has asserted that the main reason she cannot work is because of her migraines (*see, e.g.*, Tr. 595–97 (Plaintiff's hearing testimony regarding the severity and unpredictability of her migraines)).  Thus, the court finds that the ALJ's second reason for discounting the opinion of Dr. Zondlo is only partially supported by the record.[12]

Again, as with the case of Dr. Javellana, the ALJ's reasoning is only partially supported by the record.  However, unlike the case of Dr. Javellana, the undersigned cannot conclude that the only reason for discounting Dr. Zondlo's opinion with substantial support in the record (i.e., Plaintiff's ability to work at Twelve Oaks) is enough to uphold the ALJ's ultimate conclusions regarding Dr. Zondlo.  First, as previously noted, the ALJ did not specifically point to Plaintiff's job at Twelve Oaks as the "work activity" to which he referred, so the undersigned is not certain that it is the work he actually considered.  Second, and again unlike the case with Dr. Javellana, the ALJ's other reason (i.e., that Plaintiff got relief from injections) is only partially supported by the record.

Moreover, the ALJ failed to acknowledge Dr. Zondlo's additional opinion that Plaintiff was "disabled" (*see, e.g.*, Tr. 297) and addressed only his opinion that Plaintiff's pain would be distracting to the adequate performance of work (*see* Tr. 22).  The court recognizes that the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  Title 20 C.F.R. § 404.1527(e)(3) and § 416.927(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  However, although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  Here, it does not appear that the ALJ followed this directive.  Furthermore, the ALJ failed to address Dr. Zondlo's opinion that

---

[12]Notably, the Commissioner has not addressed this particular reason of the ALJ (*see* Doc. 17).  In discussing the ALJ's discounting of Dr. Zondlo's opinion, the Commissioner states only: "Indeed, while [Dr. Zondlo] did say that Plaintiff had significant pain and headaches, the says [sic] record also says that she was working 'as a salesperson at Amazon bookstore 20 hours per week and also does ebay sales'" (*id.* at 6).  This is not enough to discount the opinion of a treating physician, especially when the record contains no description of her online job duties or demands.

Case No. 3:07cv245/LAC/EMT

Plaintiff's underlying medical condition is consistent with the pain she experiences (*see* Tr. 22, 488). This opinion of Dr. Zondlo is consistent with his treatment notes to the extent the notes document Plaintiff's persistent complaints of pain (*see, e.g.*, Tr. 296, 301, 307) and her decision to undergo diagnostic injections and/or radiofrequency denervation, which Dr. Zondlo opined were "medically necessary and indicated," but which provided only partial or insufficient relief, and apparently caused Plaintiff to experience significant anxiety, even becoming "hysterical" during one attempted procedure (*see, e.g.*, Tr. 299, 301–02, 304, 523).   Thus, the court finds that the ALJ erred in discounting the opinion(s) of Dr. Zondlo.

This court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  Title 42 U.S.C. § 405(g).  Remand is ordinarily appropriate for rehearing if the Commissioner failed to apply the law and regulations, or where the taking of additional evidence is necessary.  It is the law of this Circuit, however, that where the ALJ fails properly to discount the opinion of the treating physician, he is held as a matter of law to have accepted it as true.  MacGregor, 786 F.2d at 1050.  When evidence has been fully developed and points unequivocally to a specific finding, the court may enter the finding that the Commissioner should have made.  The court can reverse without remand where the Commissioner's decision is in plain disregard of the law and evidence.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); MacGregor, 786 F.2d at 1050; Hale, 831 F.2d at 1007.

Here, the undersigned has concluded that the ALJ failed properly to discount the opinions of Dr. Zondlo, a treating physician, and the ALJ is therefore held as a matter of law to have accepted them as true.  Accepting Dr. Zondlo's opinions as true, the VE has opined that Plaintiff is not capable of work (*see* Tr. 618 (referencing Exhibit 45F, the pain questionnaire completed by Dr. Zondlo)).   Accordingly, the ALJ's decision must be reversed for a finding of disability.[13] MacGregor, 786 F.2d at 1058.

It is therefore respectfully **RECOMMENDED** that:

---

[13]In light of this conclusion, the undersigned need not address Plaintiff's remaining contentions.

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REVERSED**, this action be **REMANDED** to the Commissioner to enter a finding of total disability and award disability benefits, and the clerk be directed to close the file

At Pensacola, Florida this 6<u>th</u> day of June 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** <u>United States v. Roberts</u>, **858 F.2d 698, 701 (11th Cir. 1988).**